The Memorandum Decision and Order below is hereby
signed.  Dated: July 21, 2008.



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| KAY ELIZABETH AIKIN, | ) | Case No. 07-00121 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| CHESTER STELLO AND URSULA | ) | |
| STELLO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 07-10017 |
| | ) | |
| KAY ELIZABETH AIKIN, | ) | **Not for Publication in** |
| | ) | **West's Bankruptcy Reporter** |
| Defendant. | ) | |

MEMORANDUM DECISION RE MOTION TO
DISMISS COUNT II OF THE AMENDED COMPLAINT

The plaintiffs commenced the above-captioned adversary
proceeding by the filing of a two-count non-dischargeability
complaint seeking a determination that a pre-petition judgment
entered in their favor against the defendant, Kay Elizabeth
Aikin, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)
and § 523(a)(4).  The court ruled that the plaintiffs' original
complaint failed to state a claim upon which relief can be

granted, but granted the plaintiffs leave to file an amended complaint, which they then filed. The defendant, Kay Elizabeth Aikin, has filed a renewed motion to dismiss Count II of the amended complaint for failure to state a claim upon which relief can be granted. For reasons explained in more detail below, the court will deny the motion.

I

> The complaint adequately alleges that the debt is non-dischargeable as a debt "for fraud or defalcation while acting in a fiduciary capacity."

The purpose of a Rule 12(b)(6) motion is "to test the legal sufficiency of the complaint." <u>Kingman Park Civic Ass'n v. Williams</u>, 348 F.3d 1033, 1040 (D.C. Cir. 2003). To survive a 12(b)(6) motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, — U.S. —, 127 S. Ct. 1955, 1974 (2007). The defendant's motion seeks dismissal of Count II of the amended complaint in which the plaintiffs allege that their claim is nondischargeable as a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

2

larceny. . . ."[1]  The plaintiffs' § 523(a)(4) count is based both on the theory that the debt was incurred "for fraud or defalcation while acting in a fiduciary capacity" and upon the alternate theory that the defendant embezzled funds.  The court will address each of these theories in turn.

The amended complaint alleges, in pertinent part, that the defendant was a general contractor who agreed to construct a home for the plaintiffs, see Compl. ¶¶ 7, 20, 32, 33, 36; that the defendant "embezzled and retained" funds held by the defendant in trust for the plaintiffs, which funds the defendant was supposed to, but failed to, disburse to subcontractors, see Compl. ¶¶ 30, 35, 36; that the defendant knowingly made false statements to the plaintiffs regarding the payment of subcontractors with the knowledge that the plaintiffs would rely on those statements, Compl. ¶¶ 31, 44; that the plaintiffs made further payments to

---

[1]  The defendant's motion contends that the plaintiffs' attempt to state a claim under § 523(a)(4) is deficient in three fundamental respects.  First, the defendant urges that the complaint fails adequately to allege that the defendant was a fiduciary within the meaning of § 523(a)(4) because it fails to allege the existence of an express or technical trust.  Second, the defendant contends that the plaintiffs have failed adequately to allege fraud or defalcation, noting that the mere allegation that subcontractors were not paid is insufficient to support a § 523(a)(4) claim.  Third, the defendant contends that the amended complaint fails to make any logical nexus between the amount of the judgment obtained in state court, which is the basis for the proof of claim filed by the plaintiffs in this bankruptcy case, and the failure of the defendant to pay subcontractors.  The court's decision will address each of these arguments.

the defendant in reliance on those statements, Compl. ¶ 43, and the plaintiffs were forced to pay approximately $46,000.00 in "double payments" for subcontractors that should have been paid through the defendant.

Section 523(a)(4) provides that a discharge under chapter 7 of the Bankruptcy Code "does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." This decision addresses first whether the plaintiffs have adequately alleged that the debt arose from the debtor's fraud or defalcation while acting in a fiduciary capacity (the issue of embezzlement is addressed in part II, below).

A.   The complaint adequately alleges defalcation.

Without reaching the question of whether the complaint adequately alleges fraud,[2] the court finds that the plaintiffs have adequately pled that the defendant committed defalcation. Some courts hold that "defalcation can be shown by simply proving that a fiduciary failed to return property or account for same, even though no fraud, embezzlement, or even misappropriation on the part of the fiduciary is shown. In short, 'innocent' conduct

---

[2] Because the court concludes that the plaintiffs have adequately alleged defalcation, and it "is clear that defalcation requires a lesser standard than fraud . . . ." see Schwager v. Fallas (In re Schwager), 121 F.3d 177, 185 (5th Cir. 1997), it is unnecessary for the court to decide whether the complaint also states a § 523(a)(4) claim predicated on the commission of fraud while acting in a fiduciary capacity.

can constitute defalcation." Bamco v. Reeves (In re Reeves), 124 B.R. 5, 6 (Bankr. D.N.H. 1990) (internal citations omitted). Some courts, however, apply a recklessness standard, defining defalcation as "a willful neglect of duty, even if not accompanied by fraud or embezzlement." Schwager v. Fallas (In re Schwager), 121 F.3d 177, 184 & 185 n.12 (5th Cir. 1997), quoted in Barrett v. Clarendon Nat'l Ins. Co., 1999 WL 184117, at *6 (N.D. Tex. March 26, 1999). Still other courts have held that "defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness . . . ." Denton v. Hyman (In re Hyman), 502 F.3d 61, 68 (2d Cir. 2007), citing In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002). The complaint alleges that the defendant wrongfully and intentionally misappropriated and/or embezzled funds. Regardless of whether the court treats defalcation as requiring a showing of a mere failure to return property, a showing of willful neglect in duty, or a showing of conscious misbehavior or extreme recklessness, the plaintiffs' allegations of wrongdoing adequately satisfy the most demanding of these standards, and for purposes of a Rule 12(b)(6) motion to dismiss, the court finds that the complaint thus adequately alleges defalcation.

> B. The Maryland Custom Home Protection Act may support the plaintiffs' allegation that the defendant acted in a fiduciary capacity.

The court now turns to the more difficult question of

whether the defendant was acting in a fiduciary capacity when
that alleged defalcation or fraud occurred.  "For purposes of
section 523(a)(4), the meaning of the term 'fiduciary capacity'
is a question of federal law[,] which has held that the term
applies only to technical trusts, express trusts, or statutorily
imposed trusts and not to fiduciary relationships which arise
from equitable, implied[,] or constructive trusts or an agency
relationship."  Jacobs v. Mones (In re Mones), 169 B.R. 246, 255
(Bankr. D.D.C. 1994); Chapman v. Forsyth, 43 U.S. 202 (1844).
"In other words, the debtor must have been a trustee or fiduciary
before the wrong and not a trustee ex maleficio."  In re Mones,
169 B.R. at 255.  See also Davis v. Aetna Acceptance Co., 293
U.S. 328, 333 (1934) ("It is not enough that, by the very act of
wrongdoing out of which the contested debt arose, the bankrupt
has become chargeable as a trustee ex maleficio.  He must have
been a trustee before the wrong and without reference thereto.").
The court must, however, look to non-bankruptcy law to determine
whether there exist the elements of a trust relationship as
required by federal law for a fiduciary relationship to exist."
In re Mones, 169 B.R. at 255.

The alleged events having occurred in Maryland, the court
will look to Maryland state law to determine whether the
plaintiffs have adequately alleged that the defendant was acting
in a fiduciary capacity within the meaning of § 523(a)(4).  Of

6

possible relevance are two Maryland statutes that govern a general contractor's duty to properly account for funds that are advanced to the contractor and intended for payment to subcontractors.  First, the Maryland Construction Trust Statute, Md. Real Prop. Code § 9-201 to § 9-204 (1987), provides, in pertinent part, that

> (b)(1) Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors.

Md. Real Prop. Code § 9-201(b)(1).  This provision, by its own terms, purports to create a trust only in favor of subcontractors, not owners.  See In re Marino, 115 B.R. 863, 869 (Bankr. D. Md. 1990).  As the purchasers of the property rather than subcontractors who went unpaid, the plaintiffs cannot rely on Md. Real Prop. Code § 9-201(a) in support of their 11 U.S.C. § 523(a)(4) non-dischargeability claim.[3]  Id.

The Maryland Custom Home Protection Act, Md. Real Prop. Code

---

[3]  To the extent the plaintiffs paid the subcontractors, the plaintiffs may arguably be subrogated to any rights that the subcontractors would have otherwise been entitled to assert against the defendant under the Maryland Construction Trust Statute.  The court does not, however, need to decide that issue because there is an alternative basis for upholding the sufficiency of the complaint.

§ 10-501 to § 10-509 (1986), by contrast, addresses the duties

owed by a general contractor to custom home buyers:

> Any consideration received by a custom home builder in
> connection with a custom home contract shall be held in
> trust for the benefit of the buyer [the property owner
> who has contracted to have the custom home built].
> Payments made to subcontractors or suppliers in
> connection with the custom home contract shall be
> consistent with the trust.

Md. Real Prop. Code § 10-502.  This provision purports to create

a trust in favor of custom home buyers and may, thus, supply a

basis for concluding that the plaintiff has adequately alleged

that the defendant acted in a fiduciary capacity for purposes of

11 U.S.C. § 523(a)(4).[4]

> 1.  Statutorily imposed trusts qualify as express or
>     technical trusts if they impose sufficient trust-
>     like duties on the party entrusted with funds and
>     the trust arises prior to and independent of any
>     alleged wrongdoing.

The court will first address the threshold question of

whether a statutorily imposed trust can ever constitute an

---

[4]  Under the Custom Home Protection Act, a custom home is
defined as "a single-family dwelling constructed for the buyer's
residence on land currently or previously owned by the buyer."
Md. Real Prop. Code § 10-501(c).  The Act applies to custom home
contracts, which are defined as "any contract entered into with
the buyer, with a value equal to or greater than $20,000, to
furnish labor and material in connection with the construction,
erection, or completion of a custom home.  A custom home contract
does not mean an agreement for work to be done by a licensed home
improvement contractor and subject to the provisions of Maryland
Home Improvement Law."  By alleging that the contract was for the
construction of the plaintiffs' home at a fixed price of
$545,107.00, the plaintiffs have adequately alleged that the
contract was a custom home contract within the meaning of the
Custom Home Protection Act.

express or technical trust for purposes of § 523(a)(4).  Some courts hold that a trust created by statute is by definition not an express or technical trust and therefore cannot support a finding that the debtor was acting in a fiduciary capacity for purposes of § 523(a)(4).  See In re Heilman, 241 B.R. 137, 160-61 (Bankr. D. Md. 1999) (rejecting the proposition that express or technical trusts can be created solely by statute and likewise rejecting the proposition that an express trust can be created even if a statute provides that a trust exists in advance of a default, identifies a res, and provides that it be held in trust by one party for the benefit of another); In re Holmes, 117 B.R. 848, 853 (Bankr. D. Md. 1990) ("Because the creation of an express trust depends upon the intention of the parties, an express trust can never be created by statute alone.").

The majority of courts, however, take the view that "[t]he 'technical' or 'express' trust requirement includes relationships in which trust-type obligations are imposed pursuant to statute

or common law."[5]  Lovell v. Stanifer (In re Stanifer), 236 B.R.

709, 714 (B.A.P. 9th Cir. 1999); id. at 715 (noting that Ninth

Circuit decisions "recognize[] that either statutes or case law

can give rise to a trust within the meaning of § 523(a)(4)"); In

re Owens, 54 B.R. 162, 164 (Bankr. D.S.C. 1984) ("The term

'fiduciary capacity' as it is used in 11 U.S.C. § 523(a)(4)

applies only to technical trusts, express trusts, or statutorily

imposed trusts, the term does not apply to fiduciary

relationships which arise out of equitable or implied trusts or

trusts implied by law as arising out of a contract."); In re

Porter, 2008 WL 114914, at *3 (Bankr. N.D.W. Va. Jan. 10, 2008)

---

[5]  The Ninth Circuit Bankruptcy Appellate Panel has observed
that decisions addressing whether a state's construction trust
statute renders a debtor a fiduciary for purposes of a
nondischargeability complaint can generally be divided into three
categories.  In re Baird, 114 B.R. 198 (B.A.P. 9th Cir. 1990),
quoted in In re Nicholas, 956 F.2d 110, 112 (5th Cir. 1992).
First, there are those state statutes that only impose criminal
or other penalties when a contractor fails to properly disburse
the funds.  When faced with this type of statute, courts
generally find that no fiduciary duty arises for purposes of
§ 523(a)(4) because the trust relationship does not arise prior
to the wrongdoing.  In re Baird, 114 B.R. at 202 (citing cases).
Second are the decisions addressing state statutes that
"expressly designate the funds received by the contractor as
trust funds and which explicitly impose specific and detailed
duties on the contractor regarding the funds . . . ."  Id. at
203.  Those statutes are treated as giving rise to a fiduciary
relationship of the type required to support a § 523(a)(4)
nondischargeability complaint.  Id.  Finally, there are those
cases that address statutes that label the funds "trust" funds,
but fail to impose detailed duties upon the contractor with
respect to those funds.  Courts have arrived at different
conclusions when faced with such statutes.  Id. (citing and
comparing cases).

("To have a technical or express trust, however, no requirement

exists that there be a formal trust agreement; rather, a

'fiduciary duty' sufficient to support a § 523(a)(4) cause of

action includes trust-type obligations that are imposed pursuant

to a statute or the common law."); LSP Inv. P'ship v. Bennett (In

re Bennett), 989 F.2d 779, 784-85 (5th Cir. 1993) ("Most courts

today . . . recognize that the 'technical' or 'express' trust

requirement is not limited to trusts that arise by virtue of a

formal trust agreement, but includes relationships in which

trust-type obligations are imposed pursuant to statute or common

law."); In re Regan, 477 F.3d 1209, 1211 n. 1 (10th Cir. 2007)

(Colorado construction lien statute creates an express or

technical trust for purposes of § 523(a)(4)); In re Hentges, 373

B.R. 709, 722 (Bankr. N.D. Okla. 2007) ("The express or technical

trust [contemplated by § 523(a)(4)] may arise under a trust

agreement, or it may be imposed by statute."); Quaif v. Johnson,

4 F.3d 950 (11th Cir. 1993) (certain statutory trusts can support

the finding of a fiduciary duty for purposes of § 523(a)(4)); In

re Manelos, 337 B.R. 409, 413 (Bankr. D.N.M. 2006) ("Trusts

imposed by state statutes are technical trusts, which may lead to

the existence of a fiduciary relationship." (quoting In re Neal,

324 B.R. 365, 370 (Bankr. W.D. Okla 2005)); In re Murphy, 297

B.R. 332, 348 (Bankr. D. Mass. 2003) ("A technical trust is one

that is imposed by either statutory or common law."); In re Rea,

245 B.R. 77, 87 (Bankr. N.D. Tex. 2000) (a technical trust may be
imposed by law); In re Watford, 374 B.R. 184, 190 (Bankr.
M.D.N.C. 2007) ("A statute may give rise to a fiduciary
relationship of the type required for nondischargeability under
Section 523(a)(4)."); In re Suarez, 367 B.R. 332, 351 (Bankr.
E.D.N.Y. 2007) ("An express trust may be created by formal trust
agreement or by statute."); In re Angelle, 610 F.2d 1335, 1340
(1980) ("Under certain statutes, it is entirely fair to charge
contractors with intent to create a trust simply because they
have entered into a contract governed by a statute.").  This
court will follow the majority view in finding that, to the
extent a statute imposes actual and detailed trust-like duties
independent of and prior to any wrong committed by the putative
trustee, a statutorily imposed trust may constitute an express or
technical trust for purposes of § 523(a)(4).

2.    The Maryland Custom Home Protection Act imposes
trust-like duties on custom home builders without
reference to any wrongdoing and can be relied upon
to support a finding that the debtor acted in a
fiduciary capacity.

As already discussed, § 10-502 of the Maryland Custom Home

Protection Act provides that:

Any consideration received by a custom home builder in
connection with a custom home contract shall be held in
trust for the benefit of the buyer [the property owner
who has contracted to have the custom home built].
Payments made to subcontractors or suppliers in
connection with the custom home contract shall be
consistent with the trust.

Section 10-504, in turn, requires, with limited exceptions, that

custom home builders place a buyer's advance payments in an

escrow account:

(a)(1) Except as provided under paragraph (4) of this
subsection and in subsection (e) of this section, a custom
home builder who receives consideration from a buyer in
connection with the performance of a custom home contract
shall place the consideration into an escrow account to the
extent that the consideration is a payment in advance of the
completion of the labor or the receipt of the materials for
which the consideration is paid.

(2) The escrow account under paragraph (1) of this
subsection shall be separate and apart from the regular
funds of the builder in order to assure that the advance
payment in the escrow account can be returned to the buyer
if the buyer becomes entitled to the return of the advance
payment.  However, a builder may place advance payments
received in connection with more than one home into a
single escrow account.

(3) If the advance payment under paragraph (1) of this
subsection is made in the form of a check or draft, a
custom home builder may accept the advance payment only in
the name of the escrow account.

13

(4) If consideration received under the home contract in advance of the completion of the labor or the receipt of materials for which the consideration is paid does not total in excess of 5 percent of the home contract price, that consideration need not be placed in an escrow account under paragraph (1) of this subsection.

(b) A custom home builder may make withdrawals from an escrow account established in compliance with subsection (a)(1) of this section solely for the purpose of:

(1) Returning all or a portion of the sum of money to the buyer;

(2) Paying documented claims of persons who have furnished labor or material, including fuel, according to the draw schedule in the custom home contract for which the funds were advanced;

(3) Paying a sum of money to the custom home builder if the buyer forfeits the sum under the terms of the contract of sale; or

(4) Final payment upon the issuance of an occupancy permit or possession.

(c) In lieu of the escrow account required under subsection (a) of this section, a custom home builder may establish and maintain a separate escrow account for each custom home contract for which he receives consideration that he would be required to place into escrow under subsection (a).  Each individual escrow account shall require the signature of both the buyer and the custom home builder for any withdrawal.  Deposits and withdrawals to and from this account shall be governed by the requirements of subsections (a) and (b) of this section.

(d)(1) In lieu of the escrow accounts required under subsection (a) or (c) of this section, a custom home builder may obtain and maintain a corporate surety bond in the form and in the amounts required of a vendor or a builder under § 10-302 of this title.

(2) The surety bond obtained shall be conditioned on the return of the sum to the buyer in the event the buyer becomes entitled to the return of the money.

(3) The custom home builder shall maintain the surety bond

14

until the custom home builder complies with § 9-114 of
this article.

(e) This section does not apply to:

(1) A custom home contract financed by a mortgage loan
issued by a federally chartered financial institution or a
financial institution regulated under the Financial
Institutions Article; and

(2) A sale by or through a licensed real estate broker in
connection with which all sums of money in the nature of
deposits, escrow money, or binder money are paid to a
broker to be held in the escrow account of the broker.

The determinative factor in deciding whether a statutorily
imposed trust constitutes a technical trust for purposes of §
523(a)(4) is whether the statute in question "impose[s]
traditional trust-like relationships prior to and without
reference to the wrong which created the debt." In re Bucci, 493
F.3d 635, 640 (6th Cir. 2007) (observing that in the 6th Circuit
the application of the defalcation provision of § 523(a)(4) is
limited to express and technical trusts and that "a statute may
create a trust for purposes of § 523(a)(4) if that statute
defines the trust res, imposes duties on the trustee, and those
duties exist prior to any act of wrongdoing.").  The Maryland
Custom Home Protection Act does just that.[6]

_____

[6]  If a custom home builder wishes to be made exempt from
the duty to open an escrow account under § 10-504(a) or (c), it
must obtain a surety bond in accordance with § 10-504(d)(1)-(3).
Although the court acknowledges that this option is available
under the statute, the default obligation of the custom home
builder is to establish an escrow account in accordance with
§ 10-504(a) or (c).

15

pt

First, the trust arising under the statute arises upon the custom home builder's receipt of the funds, and does not arise incident to the contractor's violation of the statute or mishandling of funds.[7]  See Md. Real Prop. Code § 10-502.  Among the duties imposed by the Maryland Custom Home Protection Act is the home builder's establishment of escrow accounts for advance payments made by the buyer that exceed 5% of the contract price.[8]  See Md. Real Prop. Code § 10-504(a)(4), (c).  The funds placed into the escrow account are to be kept separate from the regular funds of the builder, and although the home builder may permissibly co-mingle funds in the escrow account paid to it "in connection with more than one home", Md. Real Prop. Code § 10-504(a)(2), the home builder may only withdraw funds from the

---

[7]  Although no crime must be perpetrated for the trust to come into existence, violations of the statute will in some instances constitute a crime.  See Md. Real Prop. Code §10-507 Effect of violations.

[8]  The complaint alleges that the contract price was $545,107.00 and that the plaintiffs gave the defendant an initial deposit of $81,766.05 and $351,238.44 thereafter.  The complaint further alleges that at least $46,000.00 of that amount was intended for payment of subcontractors, but was instead retained for the defendant's own use.  Although the complaint does not parse out what amounts were "advance payments," for purposes of this motion, the court finds that the plaintiffs have adequately alleged that they made advance payments in excess of 5% of the contract price such that the escrow account requirements of the Custom Home Protection Act apply.

escrow account for certain specified purposes.[9]  See § 10-
504(b)(1)-(4); In re Baird, 114 B.R. 198, 203 (B.A.P. 9th Cir.
1990) (fiduciary duty arose under Arizona statute that, although
not requiring segregation of funds, limited the use of trust
funds to satisfaction of claims of beneficiaries); Carey Lumber
Co. v. Bell, 615 F.2d 370 (5th Cir. 1980) (same under Oklahoma
law); Kraemer v. Crook, 94 B.R. 207, 208 (N.D. Ga. 1988) ("If . .
. a statute imposes requirements like a traditional trust, such
as segregating and keeping separate records of funds, and a
requirement that the person pay out funds according to a
statutory scheme, it would be sufficient to find a fiduciary
relationship [for purposes of § 523(a)(4)]."); In re Angelle, 610
F.2d 1335, 1340 (5th Cir. 1980) (for a fiduciary duty to arise
under a statutory trust for purposes of § 523(a)(4), it should
impose duties such as those that would traditionally be imposed
on a trustee such as segregating and keeping records of trust

---

[9]  The court notes that the statute permits contractors to
deposit advances made "in connection with more than one home" in
the same escrow account.  See Md. Real. Prop. Code
§ 10-504(a)(2).  Because the statute strictly limits the
contractor's use of those funds, however, traditional tracing
methods should still permit any given client to trace amounts it
has paid in connection with any particular home. See e.g., Quaif
v. Johnson, 4 F.3d 950, 954 (11th Cir. 1993) ("The Georgia
statute requires that the [insurance] premiums must be separate
from other types of funds, but may be kept in a common premium
account as long as there were adequate records of the sources of
these funds.  The court finds that this is sufficient
'segregation' to satisfy the requirement that the fiduciary
duties be created prior to the act of defalcation.").

funds and paying them out according to a statutory scheme).

Consistent with decisions from numerous other jurisdictions, this court finds that the statutorily imposed trust arising under the Maryland Custom Home Protection Act, which requires a contractor to segregate funds (which then, effectively, becomes the res) and strictly limits the contractor's disbursement of those funds, imposes traditional trust-like duties independent of any wrongdoing or violation of the statute and can therefore be used to support a finding that the statutory trust is a technical or express trust for purposes of § 523(a)(4). Once the plaintiffs made advance payments to the defendant in an amount exceeding 5% of the contract price, a trust was created under the

Maryland Custom Home Protection Act and a fiduciary duty arose.[10]

> 3. The plaintiffs have adequately alleged that the individual defendant, as opposed to her corporation, was the custom home builder the plaintiffs contracted with to build their home.

The duties imposed by the Maryland Custom Home Protection Act are imposed only on custom home builders, which the statute defines as "any person who seeks, enters into, or performs custom home contracts." Md. Real Prop. Code § 10-501(d). Under the

---

[10] At least one court has held that the Maryland Custom Home Protection Act creates a technical trust in favor of the buyer/owner such that a "violation of this trust could satisfy the fiduciary capacity requirement of 11 U.S.C. § 523(a)(4) for denying dischargeability of a debt created thereby as to a buyer/owner." In re Marino 115 B.R. 863, 869 (Bankr. D. Md. 1990). The Marino court concluded that the Maryland Custom Home Protection Act could not be relied upon by the claimants in that case, however, because the statute creates a technical trust in favor of owners/buyers, and the claimants were subcontractors. Id.

Several years after In re Marino was decided, another decision concluded that the Maryland Custom Home Protection Act cannot be relied upon to establish the existence of a fiduciary duty for purposes of § 523(a)(4), holding that "[a] statute alone cannot, in the absence of the parties' expressed intention, create an express or technical trust," and, under Maryland law, in the absence of such an expressed intention and notwithstanding the language of the Maryland Custom Home Protection Act, the relationship between a custom homebuilder and a custom homebuyer is "an ordinary commercial relationship," not that of a fiduciary for purposes of § 523(a)(4). In re Heilman, 241 B.R. 137, 162, 164 (Bankr. D. Md. 1999). As previously noted, however, this court disagrees with the premise that a statutorily imposed trust can never constitute an express or technical trust. The In re Heilman court having categorically rejected the proposition that a statutorily imposed trust may qualify as an express or technical trust for purposes of § 523(a)(4), its holding is not instructive here.

Maryland Custom Home Protection Act, a custom home builder "is a
person who occupies the position of a general contractor with
respect to the building of the home," Deyesu v. Donhauser, 846
A.2d 28, 33 (Md. 2004), and at least one court has held that the
fiduciary duties imposed on a corporate custom home builder do
not extend to that corporation's officers and directors. In re
Marino, 115 B.R. at 871.  It is unnecessary for this court to
decide whether the fiduciary duty arising under the Custom Home
Protection Act extends to a corporate entity's officers and
directors because, by alleging that the defendant, and not
Capital Custom Homes, Inc., was a general contractor who
undertook to build the plaintiffs' home, the plaintiffs have
adequately alleged that the defendant was a custom home builder
within the meaning of the Maryland Custom Home Protection Act.
Although the amended complaint refers more than once to the
defendant's company, Capital Custom Homes, Inc., and the
allegations make clear that this corporate entity is alleged to
have been in some way connected to the construction project in
question, the allegations refer consistently to the defendant,
and not the defendant's company, as the general contractor.
Thus, when construing the allegations of the complaint in the
light most favorable to the plaintiffs, see Gustave-Schmidt v.
Chao, 226 F. Supp. 2d 191, 195 (D.D.C. 2002), it is reasonable to
infer that any agreement or obligation to construct the

20

plaintiffs' home is alleged to have been between the plaintiffs

and the defendant, and not between the plaintiffs and the

defendant's company.[11]


## II

The complaint adequately alleges that the defendant embezzled
funds such that the claim is nondischargeable under § 523(a)(4).

Unlike a § 523(a)(4) claim predicated upon fraud or

defalcation, to state a § 523(a)(4) claim for non-

dischargeability based upon embezzlement or larceny it is

unnecessary to show that the defendant was acting in a fiduciary

capacity.   See Collier on Bankruptcy, ¶ 523.10[1][c] (15th ed.

---

[11] Although it is not this court's task to speculate what a
more complete evidentiary record will reveal, as the court has
already noted, the trust obligations arising under the Maryland
Custom Home Protection Act are imposed only on the custom home
builder, and it is doubtful that those duties extend to a
corporate contractor's officers, directors, or employees.   See In
re Marino, 115 B.R. 863, 871 (Bankr. D. Md 1990) ("The Act does
not include in the definition of custom home builder an officer,
director, or employee of a corporate entity which enters into the
custom home contract . . . . [and] [t]he custom home builder, for
purposes of liability under the Act, is the Contractor entity,
and not [the individual debtor], whether as an officer, director,
owner or employee of Contractor.").   See also Longfellow
Apartments, LLC v. Potillo (In re Potillo), AP No. 04-10046, slip
op. at 11-16 (Bankr. D.D.C. Jan. 9, 2006) (discussing extent to
which fiduciary duties imposed upon corporate entity can be
extended to that entity's officers and directors) (copy
attached).   Thus, if it is later determined that the defendant's
company, and not the defendant, was the custom home builder that
contracted to build the plaintiffs' home, the defendant is free
to renew the defendant's challenge to the plaintiffs' assertion
that the defendant was acting in a fiduciary capacity for
purposes of § 523(a)(4).

2001) (the phrase "while acting in a fiduciary capacity"

qualifies only the words "fraud or defalcation" and not

"embezzlement" or "larceny", and "the implication is that the

discharge exception applies even when the embezzlement or larceny

was committed by someone not acting as a fiduciary."); Anzalone

v. Dulgerian (In re Dulgerian), 2008 WL 919607, at *6 (Bankr.

E.D. Pa. April 1, 2008).  Embezzlement for purposes of this

section "has been defined to mean 'the fraudulent appropriation

of property by a person to whom such property has been entrusted,

or into whose hands it has lawfully come.'"  In re Savage, 371

B.R. 171, 174 (E.D. La. 2007), quoting Miller v. J.D. Abrams,

Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir. 1998).  To show

embezzlement for purposes of § 523(a)(4), it is necessary for the

plaintiffs to show: "(1) that [they] entrusted [their] property

to the debtor, (2) that the debtor appropriated the property for

a use other than that for which it was entrusted, and (3) that

the circumstances indicate fraud."  Cash Am. Fin. Servs. v. Fox

(In re Fox), 370 B.R. 104, 115-16 (B.A.P. 6th Cir. 2007)

(internal quotations omitted).  The court finds that the

complaint adequately states a claim for embezzlement in support

of a § 523(a)(4) nondischargeability complaint.

    The complaint alleges that the defendant knowingly, and with

the intent to induce the plaintiffs to continue making payments

to the defendant, made false statements about paying

subcontractors and then, in contravention to the defendant's
position as general contractor, proceeded to retain the funds
paid to the defendant by the plaintiffs rather than paying the
subcontractors.  Compl. ¶¶ 31, 36, 42-44.  This sufficiently
alleges that the defendant was entrusted with funds, and
appropriated the property for a use other than payment of
subcontractors, under circumstances that indicate fraud.

The complaint further alleges that the defendant was holding
the funds at issue in trust for the homeowner for distribution to
the subcontractors.  This allegation is sufficient to satisfy the
requirement that the funds at issue did not belong to the
defendant, and were, in some fashion, still property of the
plaintiffs as required to state a claim for embezzlement.  See In
re Dulgerian, 2008 WL 919607, at *3 (Bankr. E.D. Pa. April 1,
2008) (observing that "[o]ne cannot embezzle one's own
property.").  Accordingly, the court finds that the plaintiffs
have adequately pled a § 523(a)(4) claim for nondischargeability
based upon embezzlement.


III

The defendant contends that the amended complaint fails to
make any logical nexus between the amount of the judgment
obtained in state court, which is the basis for the proof of
claim filed by the plaintiffs in this bankruptcy case, and the

failure to pay subcontractors.  The allegations of the complaint
clearly establish that *some* amount of debt is alleged to be
nondischargeable.  Because the exact amount of the debt that is
nondischargeable is a matter to be proven at trial, the court
concludes that the plaintiffs' failure to allege the precise
amount of the debt sought to be declared nondischargeable is not
sufficient to warrant dismissal of the complaint.


                                    IV

     For all of these reasons, the court will deny the
defendant's motion to dismiss Count II of the amended complaint.

     An order follows.


                        [Signed and dated above.]

Copies to: All counsel and parties of record; Office of United
States Trustee.

                                    24

The opinion below is hereby signed.   Dated: January
5, 2006.


_S. Martin Teel Jr._
_____
S. Martin Teel, Jr.
United States Bankruptcy Judge


UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA


In re                          )
                               )
EDUARDO R. POTILLO,            )    Case No. 04-00146
                               )    (Chapter 7)
              Debtor.          )
_____  )
                               )
LONGFELLOW APARTMENTS, LLC,    )
*et al.*,                      )
                               )
              Plaintiffs,      )
                               )
         v.                    )    Adversary Proceeding No.
                               )    04-10046
EDUARDO R. POTILLO,            )
                               )
              Defendant.       )


OPINION AMENDING AND SUPPLEMENTING FINDINGS OF FACT AND
CONCLUSIONS OF LAW ANNOUNCED ON NOVEMBER 23, 2005

     The plaintiffs, Longfellow Apartments, LLC ("Longfellow"),

Allison Apartments, LLC ("Allison"), and Randolph Apartments, LLC

("Randolph"), initiated this adversary proceeding to obtain a

determination that amounts allegedly owed by the defendant

Eduardo R. Potillo to Longfellow in the amount of $54,601.00, to

Allison in the amount of $68,573.00, and to Randolph in the

amount of $71,872.00 were non-dischargeable pursuant to 11 U.S.C.

§§ 523(a)(2), 523(a)(4), and 523(a)(6).  A trial was held on

November 22, 2005, and November 23, 2005, after which the court

announced its findings of fact and conclusions of law from the

bench.  The court ruled that Potillo owes $43,295.00 to

Longfellow, $68,573.00 to Allison, and $71,872.00 to Randolph.

The court further ruled that these debts are non-dischargeable

under 11 U.S.C. § 523(a)(4), and that the plaintiffs are entitled

to interest on their judgments at the statutory rate of 6% per

annum specified by D.C. Code § 28-3302.  See Duggan v. Kato, 554

A.2d 1126 (D.C. 1989).[1]  This opinion amends and supplements the

court's earlier ruling.

I

The plaintiffs are three separate apartment complexes with a

single owner.  Potillo was the co-owner and principal of

Washington & Jackson Investments, LLC ("W & J").  Potillo,

operating through W & J, entered into management contracts with

all three apartment complexes.  (Pl. Ex. 1-3).  Thereafter,

Potillo managed the properties of the apartment complexes

pursuant to the management agreements and District of Columbia

law.  In that capacity, Potillo was responsible for collecting

all rents and maintaining them in an "Operating Account,"

---

[1]  The court did not award attorneys' fees to the
plaintiffs.

2

collecting all security deposits and maintaining those deposits in a separate account, paying all expenses of the apartment complexes out of the Operating Account, maintaining and leasing the properties, and handling the daily business of running the complexes in general.

The plaintiffs alleged numerous violations of Potillo's contractual and statutory obligations in managing the apartments at trial. They claimed that Potillo deposited tenant security deposits into W & J's Operating Account in contravention of District of Columbia law and then paid W & J operating expenses out of the intermingled funds, that W & J used these funds to pay not only expenses relating to the plaintiffs' buildings, but also other W & J business expenses, and that W & J continued to deposit rent checks received from the District of Columbia Housing Authority ("DCHA") into a W & J account for months after W & J terminated its management agreement with the plaintiffs. Longfellow also claimed that Potillo failed to file an insurance claim on a fire-damaged apartment in a timely manner, thereby causing six months of lost rent in that apartment, and allowed a personal acquaintance to stay in two apartments rent-free for a total of six months.

Potillo conceded at trial that he failed to keep tenant security deposits that he collected in a segregated account as required by D.C. law, that these funds were used to pay unrelated

3

W & J business expenses, and that this failure was a breach of
his fiduciary duty to the plaintiffs.  Longfellow, for its part,
withdrew its claim based on the failure of Potillo to file an
insurance claim on one fire-damaged apartment upon discovering at
trial that rents from the apartment were received after the fire
occurred.

The court, relying in part on a detailed "Accounting
Reconciliation" prepared by Potillo (Pl. Ex. 7), concluded that
Potillo owed Longfellow $30,103.11 for Operating Account assets
used to pay other W & J business expenses plus another $9,352.00
for misused security deposits and $3,840.00 for lost rents
created by Potillo's decision to allow an acquaintance to stay in
Longfellow apartments rent-free for six months.  The court
further concluded that Potillo owed Allison $60,762.00 for
misused Operating Account assets plus $7,811.00 for misused
security deposits.  Finally, the court concluded that Potillo
owed Randolph $61,374.00 for misused Operating Account assets
plus $10,498.00 for misused security deposits.

The court held that Potillo was not liable for unlawfully
held DCHA deposits because there was no evidence that Potillo
knew that these deposits were occurring at the time or profited
from them.  It also held that Potillo was not liable for any
incidental expenses caused by the person who lived rent-free at
Longfellow because there was no way to verify or quantify such

4

expenses.  Finally, the court held that the debts owed by Potillo

to the plaintiffs were non-dischargeable under 11 U.S.C. §

523(a)(4).  It is this legal determination that the court amends

and supplements below.

II

"Section 523(a)(4) of the Bankruptcy Code provides that a

discharge under the Code does not discharge an individual debtor

'from any debt . . . for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny[] . . . .'" Old

Republic Sur. Co. v. Richardson (In re Richardson), 193 B.R. 378,

380 (D.D.C. 1995).  Potillo's actions constitute both a

"defalcation while acting in a fiduciary capacity" and

embezzlement within the meaning of § 523(a)(4).  Consequently,

the debts created by his malfeasance are not subject to

discharge.

A.   Defalcation by a Fiduciary

To prevail under the "defalcation" provision of § 523(a)(4),

"[the p]laintiffs must prove that (1) the defendant was obligated

to the plaintiff in a fiduciary capacity; (2) the defendant

committed fraud or defalcation while acting in his fiduciary

capacity; and (3) the plaintiff's debt resulted from such fraud

or defalcation."  Jacobs v. Mones (In re Mones), 169 B.R. 246,

255 (Bankr. D.D.C. 1994).  As set forth in part I of this

opinion, the court has already ruled that Potillo's debts to the

5

plaintiffs are a result of his misuse of funds in W & J's
Operating Account and separate account for security deposits.
The court will therefore not address the third prong of the
standard employed in In re Mones.

Counsel for Potillo also acknowledged at trial that Potillo
was a "fiduciary" for purposes of § 523(a)(4), and plaintiffs
assumed that the identities of W & J and Potillo were one and the
same in determining the extent of Potillo's liability--an
assumption borne out by the evidence presented at trial.
Potillo's waiver on this point renders consideration of the first
prong of the In re Mones standard unnecessary.  Nevertheless, out
of an abundance of caution, the court will conduct its own
inquiry into the nature of Potillo's relationship with the
plaintiffs.

    1.  <u>Fiduciary capacity</u>

"For purposes of section 523(a)(4), the meaning of the term
'fiduciary capacity' is a question of federal law[,] which has
held that the term applies only to technical trusts and not to
fiduciary relationships which arise from equitable, implied[,] or
constructive trusts or an agency relationship."  <u>In re Mones</u>, 169
B.R. at 255.  In other words, "the debtor must have been a
trustee or fiduciary before the wrong and not a trustee <u>ex
maleficio</u>."  <u>Id.</u>  "[T]he courts must look to non-bankruptcy law
to determine whether there exist the elements of a trust

6

relationship as required by federal law for a fiduciary

relationship to exist." Id.

Courts in the District of Columbia have adopted the

definition of a trust set forth in the Restatement of Trusts.

See Cabaniss v. Cabaniss, 464 A.2d 87, 91 (D.C. 1983). Applying

the Restatement, the D.C. Court of Appeals held in Cabaniss that

> The elements of a trust, including an inter
> vivos trust created for the benefit of a
> third person, are the following: 1) a
> trustee, who holds the trust property and is
> subject to equitable duties to deal with it
> for the benefit of another; 2) a beneficiary,
> to whom the trustee owes equitable duties to
> deal with the trust property for his benefit;
> [and] 3) trust property, which is held by the
> trustee for the beneficiary.

Id.; see also Air Transport Ass'n of Am. v. Prof'l Air Traffic

Controllers Org. (In re Prof'l Air Traffic Controllers Org.

(PATCO)), 26 B.R. 337, 342 (Bankr. D.D.C. 1982) (defining a trust

under District of Columbia law by reference to the Restatement of

Trusts).  While the Cabaniss court concluded that "[n]o

particular form of words or conduct is necessary to manifest an

intention to create a trust," id.,[2] the court regarded "the

settlor's manifestation or external expression of his intention

to create a trust" to be "[e]ssential to the creation of a

---

[2]   See also In re Prof'l Air Traffic Controllers Org.
(PATCO), 26 B.R. at 343 (discounting "mere fact that the terms
'trust' or 'trustee' were not specifically employed in the actual
drafting" of a corporate resolution in holding that resolution
created express trust).

7

trust . . . ." <u>Id.</u>

      (a)  <u>Fiduciary capacity of W & J</u>

In this case, Potillo's company, W & J, was a fiduciary to the plaintiffs by virtue of the management agreements between W & J and the plaintiffs. Each agreement specified that W & J would "establish a separate tracking Operating Account within [W & J's] system for the tracking of income and expenses" (Pl. Ex. 1 ¶ 3.a; Pl. Ex. 2 ¶ 3.a; Pl. Ex. 3 ¶ 3.a). Funds within the Operating Account "remain[ed] the property of the [plaintiffs] subject to disbursement of expenses by [W & J] as described" in the management agreement (<u>id.</u>). The management agreements also required W & J to "maintain all residential rental security deposits in an interest bearing account for tenants to whom interest shall accrue as required by law" (Pl. Ex. 1 ¶ 3.c; Pl. Ex. 2 ¶ 3.c; Pl. Ex. 3 ¶ 3.c).

The management agreements created express trusts between the apartment complexes and W & J. They required W & J (the trustee) to hold certain defined funds (the trust <u>res</u>) for a specified apartment complex (the beneficiary) and use those funds for certain clearly defined purposes and subject to certain clearly

8

defined restrictions.[3]  This arrangement constituted an "express

trust" under District of Columbia law and a trust creating a

fiduciary relationship between W & J and the plaintiffs for

purposes of § 523(a)(4).  See Cabaniss, 464 A.2d at 91-92; see

also In re Prof'l Air Traffic Controllers Org., 26 B.R. at 342-

344.

(b)  Fiduciary capacity of Potillo

Whether Potillo was himself a fiduciary with respect to the

plaintiffs is a harder question.  Arguably, Potillo owed a duty

to care to the plaintiffs both as the principal of the

plaintiffs' corporate fiduciary (W & J) and as a licensed

property manager under District of Columbia law.  The court

examines the nature of these duties with respect to § 523(a)(4)

---

[3]  The benefit to the plaintiffs arising from this
arrangement is less direct with respect to the security deposit
account created by W & J only because the account was created (at
least ostensibly) to hold funds belonging to and for the benefit
of the tenants of the respective apartment complexes, not the
complexes themselves.  Under District of Columbia municipal
regulations, however, it is the owner of a residential building
(here, the plaintiffs) who is obligated to hold tenants' security
deposits "in trust" in a District of Columbia financial
institution, not the property manager.  D.C. MUN. REG. § 14-308.3.
W & J agreed to uphold this obligation on behalf of the
plaintiffs pursuant to the management agreements, but it could
not have relieved the plaintiffs of their fiduciary obligations
to their tenants.  Instead, W & J and the plaintiffs created what
was in essence a "trust within a trust" through the management
agreements in which the plaintiffs--trustees of the beneficiary
tenants' security deposits under D.C. law--became the
beneficiaries of a separate trust consisting of the same res (the
tenants' security deposits) but maintained by a separate trustee
(W & J).

in turn.

(i)

More than one court has held that the officer of a corporate
fiduciary is not a fiduciary of the creditor for purposes of §
523(a)(4) even where the creditor was a guarantor of the
corporation's debt.  See, e.g., Barclays Am./Bus. Credit, Inc. v.
Long (In re Long), 774 F.2d 875, 878-79 (8th Cir. 1985)
(officer/guarantor "was not an express fiduciary because the
document creating the trust named [the corporate debtor], rather
than [the officer], as trustee"); Conn. Nat'l Bank v. Clark (In
re Clark), 65 B.R. 306, 307-08 (Bankr. D. Conn. 1986) ("[E]ven
where loan documents purportedly establish a fiduciary
relationship between a creditor and a corporation, officers
acting as guarantors of the corporate loan have not been deemed
to be fiduciaries under § 523(a)(4) with respect to such third-
party creditors.").  The logic behind these decisions is fairly
straightforward: corporate officers are usually charged with a
corporation's fiduciary status only by virtue of local rule or
statute, and should not be so charged absent an express
provision, In re Long, 774 F.2d at 878; and imposing the
fiduciary obligations of a corporation on an officer due to the
officer's misconduct would create a trust ex maleficio, which
does not constitute an "express trust" for purposes of §
523(a)(4).  In re Clark, 65 B.R. at 308.

10

Other courts have reached the opposite conclusion.  In

Airlines Reporting Corp. v. Ellison (In re Ellison), 296 F.2d 266

(4th Cir. 2002), the Fourth Circuit concluded that a corporate

officer could be considered a fiduciary under § 523(a)(4) where

(1) the corporation breached a pre-existent fiduciary duty to a

creditor, (2) the officer owed fiduciary duties to the

corporation fiduciary under state law, and (3) the officer was

responsible for the corporation's breach.  Id. at 270-72.

Similarly, the Sixth Circuit has concluded that a corporate

officer can be considered a fiduciary under § 523(a)(4) where the

officer had "full knowledge and responsibility for the handling

of [the corporate fiduciary's] trust undertakings."  Capitol

Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate

Agency, Inc.), 760 F.2d 121, 125 (6th Cir. 1985).[4]  And at least

one bankruptcy court has concluded that corporate officers of

fiduciary companies should be considered fiduciaries under §

523(a)(4) because "a director or officer of a corporate trustee

'is under a duty to the beneficiaries to use reasonable care in

---

[4]  Accord Mostiler v. Couch, 100 B.R. 802, 808 (Bankr. E.D.
Va. 1988) (majority shareholder and CEO of corporate fiduciary
held to be a fiduciary to creditor under § 523(a)(4) as well
because the "funds were entrusted to [the corporation] and also
to [the CEO] through his absolute control of the corporate
funds"); but see Commonwealth of Ky. v. Kinnard, 1 F.3d 1240 (6th
Cir. 1993) (limiting In re Interstate Agency, Inc. to situations
where statute imposes fiduciary obligations on corporate officer
as well as corporation upon creation of a specific type of trust)
(unpublished opinion), available at 1993 WL 300425.

11

the exercise of his powers and the performance of his duties as such director or officer.'"  Global Express Money Orders, Inc. v. Davis (In re Davis), 262 B.R. 673, 683 (Bankr. E.D. Va. 2001)(quoting 4 Scott on Trusts § 326.3 at 307 (3d ed. 1967)) (emphasis in original).[5]

The common concern animating these decisions (and others like them) is the need to avoid

> a construction [of § 523(a)] so narrow as to eviscerate § 523(a)'s purpose of preventing debtors . . . from avoiding, through bankruptcy, the consequences of their wrongful conduct.

In re Ellison, 296 F.3d at 271.[6]  For these courts, an individual officer of a corporation who assumes the responsibility of carrying out that corporations' fiduciary duties as a trustee acts in a fiduciary capacity towards the beneficiary of the trust.  See In re Davis, 262 B.R. at 683.  If an officer knowingly misuses the trust funds, that officer has engaged in defalcation while acting in a fiduciary capacity.  In re Ellison, 296 F.3d at 271; see also Hemelt v. Pontier (In re Pontier), 165 B.R. 797, 798-99 (Bankr. D. Md. 1994) (officer is liable for

---

[5]  Accord Bellity v. Wolfington (In re Wolfington), 48 B.R. 920, 924 (Bankr. E.D. Pa. 1985) ("It is well established that corporate officers occupy a fiduciary relationship to the corporation and its creditors.").

[6]  Accord In re Davis, 262 B.R. at 684; Wilcoxon Constr., Inc. v. Woodall (In re Woodall), 177 B.R. 517, 522 n.2 (Bankr. D. Md. 1995); Sun Life Ins. Co. of Am. v. Koszuth (In re Koszuth), 43 B.R. 104, 108 (Bankr. M.D. Fla. 1984).

corporate fiduciary's debts only if officer "specifically directed the particular act to be done, or participated or cooperated therein").

Although there is merit to both sides of this debate, the court finds the approach taken in <u>In re Long</u> and <u>In re Clark</u> to be more persuasive in light of the Supreme Court's ruling in <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328 (1934). In <u>Davis</u>, the Court defined the term "fiduciary" in the Bankruptcy Act predecessor to § 523(a)(4) to mean only the fiduciary of an express trust. <u>Id.</u> The Court explained its ruling by pointing to the "unbroken continuity" of rulings over the prior century interpreting the term to refer only to express trusts. <u>Id.</u> As the Court explained:

> It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee <u>ex</u> <u>maleficio</u>. He must have been a trustee <u>before</u> the wrong <u>and</u> <u>without</u> <u>reference</u> <u>thereto</u>.

<u>Id.</u> (emphasis added).

To be sure, there are legitimate grounds to question the applicability of the <u>Davis</u> decision to cases like the one before this court. <u>Davis</u> concerned an automobile dealer who converted funds; unlike this case, there was no express trust in existence at all. <u>See id.</u> at 333. Courts since <u>Davis</u> have held uniformly that technical trusts created by virtue of statute confer fiduciary status upon the trustee of such a trust for purposes of

13

§ 523(a)(4), <u>see, e.g.</u>, <u>Blyler v. Hemmeter (In re Hemmeter)</u>, 242
F.3d 1186, 1190 (9th Cir. 2001) ("[f]iduciary relationships
imposed by statute may cause the debtor to be considered a
fiduciary under § 523(a)(4)"), and several courts have held that
statutes making officers and directors of a corporation
fiduciaries of that corporation also make the officer and
directors fiduciaries of the corporation for purposes of §
523(a)(4) even in the absence of a technical trust. <u>See</u> <u>In re</u>
<u>Bernard</u>, 87 F.2d 705, 706-07 (2d Cir. 1937) (corporate officers
and directors qualified as "fiduciaries" with respect to
corporation under Bankruptcy Act predecessor to § 523(a)(4)); <u>In</u>
<u>re Whitlock</u>, 449 F. Supp. 1383, 1390 (W.D. Mo. 1978).

These decisions have led some courts to conclude that the
Court in <u>Davis</u> was actually concerned solely with the timing of
the creation of the trust giving rise to fiduciary duties; <u>i.e.</u>,
that fiduciary relationships arising from or subsequent to fraud
or defalcation do not fall within the scope of the § 523(a)(4)
exception, but fiduciary relationships created before the
debtor's wrongdoing qualify for the exception regardless of
whether the relationship arises from a technical or express
trust. <u>See</u> <u>Cutter Realty Group, Inc. v. Schiraldi (In re</u>
<u>Schiraldi)</u>, 116 B.R. 359, 361-62 (Bankr. D. Conn. 1990)
(collecting cases). Under this reading of <u>Davis</u>, an officer of a
corporate fiduciary could conceivably be considered a fiduciary

14

of the corporation's beneficiary under § 523(a)(4) because the
officer's status as a fiduciary would arise from her pre-existent
relationship to the corporate fiduciary, not as a result of the
debtor's wrongdoing.

The problem with this argument is that, in the absence of an
express agreement or a statute imposing, at a minimum, some type
of fiduciary duties upon the officer with respect to a third-
party beneficiary, there is no basis on which to conclude that
the officer owes the third party any fiduciary duties at all
except for equitable or constructive duties imposed by a court
after the fact.[7]  Even if this court adopted an interpretation of
<u>Davis</u> focusing purely on the timing of the creation of the
"fiduciary" relationship, it would still be forced to conclude
that the officer of a corporate fiduciary is not a fiduciary to
the third-party beneficiary within the meaning of § 523(a)(4)
unless a fiduciary relationship was created beforehand by virtue
of agreement or statute.  As there was no such agreement or
statute in place here, the court concludes that Potillo is not a
fiduciary for purposes of § 523(a)(4) by virtue of his status as

---

[7]  This was essentially the position taken by the Eighth
Circuit in <u>In re Long</u>, and was also a point made by Judge Luttig
in his dissenting opinion in <u>In re Ellison</u>.  <u>See</u> <u>In re Ellison</u>,
296 F.3d at 274-75 (Luttig, J., dissenting); <u>In re Long</u>, 774 F.2d
at 878.

the principal of W & J.[8]   To the extent that a debt for
defalcation can arise based on an innocent mistake,[9] this
approach has the benefit of protecting corporate officers and
other employees who engage in innocent, non-negligent defaults.
To the extent that such officers or employees engage in a knowing
defalcation, the debt will nevertheless likely escape discharge
under § 523(a)(4) as a debt for embezzlement.

(ii)

Separate and apart from his status as the principal of a
corporate fiduciary to the plaintiffs, Potillo owed special
duties to the plaintiffs under District of Columbia law due to
his status as a property manager.   See D.C. CODE §§ 47-2853.141,
47-2853.195.   This section of the D.C. Code imposes numerous
"fiduciary" duties on a licensed "Property Manager" with respect
to the owner of a property, including the duty to "[p]erform in

---

[8]   The court declines to follow the In re Davis and In re
Wolfington courts in inferring some sort of common-law fiduciary
status for corporate officers.   While a corporate officer may
have a basic duty to use "reasonable care in the exercise of his
powers and the performance of his duties" with respect to the
beneficiary of a corporate fiduciary, In re Davis, 262 B.R. at
683, that nominal obligation falls far short of the kind of
responsibility contemplated by § 523(a)(4).   As for In re
Wolfington, the court in that case appears to have confused the
special obligations of a corporate officer of an insolvent
corporation to the corporation's creditors with the ordinary
obligations of a corporate officer working for a healthy, solvent
corporation.   While understandable, the court's conclusion in
that case is fundamentally flawed, and this court accordingly
rejects it.

[9]   See note 12, infra.

16

accordance with the terms of the property management agreement,"
D.C. CODE § 47-2853.195(1), the duty to "[e]xercise ordinary care"
in the management of the property, id. at § 47-2853.195(2), the
duty to "[d]isclose in a timely manner to the owner material
facts of which the licensee has actual knowledge concerning the
property," id. at § 47-2853.195(3), the duty to "[a]ccount[]
for[,] in a timely manner, all money and property received in
which the owner has or may have an interest," id. at § 47-
2853.195(5), and the duty to "[c]omply with all requirements of
[§ 47 of the D.C. Code], fair housing statutes and regulations,
and all other applicable statutes and regulations . . . ." Id.
at § 47-2853.195(6).

It is not enough, however, for a statute to label a duty
"fiduciary" in nature to create such a relationship within the
meaning of § 523(a)(4). Most courts require that the statute
"(1) define[ a] trust res; (2) identif[y] the fiduciary's fund
management duties; and (3) impose[] obligations on the fiduciary
prior to the alleged wrongdoing." In re Hemmeter, 242 F.3d at
1190.[10] Some courts have established narrow exceptions to this

---

[10]  Accord Texas Lottery Comm'n v. Tran (In re Tran), 151
F.3d 339, 342-43 (5th Cir. 1998); Metropolitan Steel, Inc. v.
Halversen (In re Halversen), 330 B.R. 291, 296-97 (Bankr. M.D.
Fla. 2005); Duncan v. Neal (In re Neal), 324 B.R. 365, 370
(Bankr. W.D. Okla. 2005); Trustees of the Colo. Ironworkers
Pension Fund v. Gunter (In re Gunter), 304 B.R. 458, 460-61
(Bankr. D. Colo. 2003); Griffith, Strickler, Lerman, Solymos &
Calkins v. Taylor (In re Taylor), 195 B.R. 624, 629 (Bankr. M.D.
Pa. 1996).

general rule for agents of an entity with special authority and
discretion to manage important assets of the entity, such as the
officer or director of a corporation, In re Bernard, 87 F.2d at
706-07, the ambassador of a sovereign nation, Republic of Rwanda
v. Uwimana (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001), or
an agent vested with durable power of attorney giving the agent
"unfettered control over the assets of a third party." BPS Guard
Services, Inc. v. Myrick (In re Myrick), 172 B.R. 633, 636
(Bankr. D. Neb. 1994).

Assuming, arguendo, that the court embraced the exceptions
carved out in In re Bernard, In re Uwimana, and In re Myrick, the
statute at issue here still would not suffice to create a
fiduciary relationship between Potillo and the plaintiffs.
Unlike the situation in those cases, there is nothing in the D.C.
Code conferring responsibilities and authority upon Potillo
"tantamount to those of a trustee of an express trust." In re
Myrick, 172 B.R. at 636. Indeed, the statute does not give
Potillo any authority at all, much less the authority (and
concomitant responsibility) to handle the plaintiffs' money.
Those duties flow from the contractual arrangement between the
parties, which, as the court has already discussed, created a
trust relationship between the plaintiffs and W & J, not Potillo.
Under any reading of § 523(a)(4), Potillo was not the fiduciary
by virtue of a statutory trust.

18

(c)   <u>Piercing of the corporate veil</u>

Nonetheless, the court concludes that in this instance
Potillo's debt to the plaintiffs is that of a fiduciary.  The
court reaches this conclusion by piercing the corporate veil of
W & J and attaching the status of the corporation as a fiduciary
to Potillo.  Under the veil-piercing doctrine, where the
corporate form is "used to shield from scrutiny a sham
transaction, . . . 'the courts will not permit themselves to be
blinded or deceived by mere forms of law but, regardless of
fictions, will deal with the substance of the transaction
involved as if the corporate agency did not exist as the justice
of the case may require.'"  <u>Christacos v. Blackie's House of
Beef, Inc.</u>, 583 A.2d 191, 196 (D.C. 1990).[11]  As even the dissent
in <u>In re Ellison</u> acknowledged, the doctrine can be used to attach
the non-dischargeable liability of a corporation (in this case,
W & J) to one of its principals (in this case, Potillo) if "there
is reason to disregard the corporate form."  <u>In re Ellison</u>, 296
F.3d at 275 (Luttig, J., dissenting).

"Generally speaking, an individual will not be liable
personally for the debts of a corporate entity unless it is
'proved by affirmative evidence that there is (1) unity of
ownership and interest, and (2) use of the corporate form to

---

[11]   District of Columbia law governs the question of whether
the court should pierce the corporate veil.  <u>Diamond Chem. Co. v.
Atofina Chemicals, Inc.</u>, 268 F. Supp. 2d 1, 7 (D.D.C. 2003).

19

perpetrate fraud or wrong.'"  <u>Simon v. Circle Associates, Inc.</u>,

753 A.2d 1006, 1011 (D.C. 2000) (quoting <u>Bingham v. Goldberg,</u>

<u>Marchesano, Kohlman, Inc.</u>, 637 A.2d 81, 93 (D.C. 1994) (internal

quotation omitted)).  As the D.C. Court of Appeals explained in a

recent opinion,

> [t]his determination in turn requires the
> consideration of a range of factors,
> including whether corporate formalities have
> been observed; whether there has been any
> commingling of corporate and shareholder
> funds, staff, and property; whether a single
> shareholder dominates the corporation;
> whether the corporation is adequately
> capitalized; and, especially, whether the
> corporate form has been used to effectuate a
> fraud.

<u>Meshel v. Ohev Sholom Talmud Torah</u>, 869 A.2d 343, 363 (D.C.

2005).

While there are many factors available for the court to

consider, "[n]o single factor is dispositive, and 'considerations

of justice and equity may justify piercing the corporate veil.'"

<u>Lawlor v. D.C.</u>, 758 A.2d 964, 975 (D.C. 2000) (quoting <u>Bingham</u>,

637 A.2d at 93).  Finally, "the decision to pierce will be

influenced by considerations of who should bear the risk of loss

and what degree of legitimacy exists for those claiming the

limited liability protection of the corporation."  <u>Vuitch v.</u>

<u>Furr</u>, 482 A.2d 811, 816 (D.C. 1984).  "The inquiry ultimately

turns on whether the corporation is, in reality, 'an <u>alter</u> <u>ego</u> or

business conduit of the person in control.'"  <u>Lawlor</u>, 758 A.2d at

20

975 (quoting Labadie Coal Co. v. Black, 672 F.2d 92, 97 (D.C. Cir. 1982)).

All of the factors delineated above support the piercing of the corporate veil in this case. There is no question that Potillo owed and breached fiduciary duties to W & J and that W & J owed and breached fiduciary duties to the plaintiffs. Ordinarily, the plaintiffs could have sued W & J directly for its breach, and, if W & J had been anything more than a front for Potillo and his partner Michael Minor, the company could have sued Potillo and obtained a non-dischargeable judgment against him under § 523(a)(4). But the plaintiffs could not have sued W & J in this instance because the company was run into the ground and then dissolved by Potillo and Minor, and the company, being a mere sham, would never have sued its owners.

Potillo used funds owned by the plaintiffs and held in trust by W & J to pay incidental personal expenses, and even hid the accreting debts of the plaintiffs from them by providing the plaintiffs with an accounting balance that Potillo knew to be false. Under these circumstances, the fiction of W & J's existence--and, to be sure, the company was about as fictional as one could imagine--should not insulate Potillo from the consequences of his own misconduct. The court will pierce the corporate veil in this instance and attach W & J's liability as a fiduciary for purposes of § 523(a)(4) to Potillo.

21

2.   <u>Defalcation</u>

Potillo's actions also constitute a "defalcation" within the meaning of § 523(a)(4).  "'Defalcation is not a synonym for fraud, embezzlement, or misappropriation, but has a broader meaning relative to the failure of a fiduciary to account for money received in a fiduciary capacity as a result of misconduct.'" <u>BCCI Holdings (Luxembourg), S.A. v. Clifford</u>, 964 F. Supp. 468, 484 (D.D.C. 1997) (quoting B. Weintraub & M. Resnick, <u>Bankruptcy Law Manual</u> ¶ 3.09[4], at 3-35 (1980)).  The test used by most courts to determine whether a fiduciary has engaged in defalcation is "essentially a recklessness standard." <u>Schwager v. Fallas (In re Schwager)</u>, 121 F.3d 177, 185 (5th Cir. 1997); <u>accord</u> <u>Meyer v. Rigdon</u>, 36 F.3d 1375, 1384-85 (7th Cir. 1997); <u>Carlisle Cashway, Inc. v. Johnson (In re Johnson)</u>, 691 F.2d 249, 257 (6th Cir. 1982); <u>Cent. Hanover Bank & Trust Co. v.</u>

22

Herbst, 93 F.2d 510, 512 (2d Cir. 1937).[12]

Potillo's actions went far beyond the realm of recklessness. According to his own testimony, Potillo, along with his partner Michael Minor, intentionally used security deposits and Operating Account funds to pay for W & J expenses that had nothing to do with the plaintiffs' buildings even though Potillo knew that these actions violated the management agreements between W & J and the plaintiffs and, in the case of tenants' security deposits, District of Columbia law. Potillo's self-composed "Accounting Reconciliation" details the amounts lost through this deliberate misappropriation and misuse of funds. Moreover,

---

[12] The standard is by no means universal. The First Circuit, for example, has held that "a defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement." Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 18-19 (1st Cir. 2002). The Fourth, Eighth, and Ninth Circuits stand at the opposite end of the spectrum, having held that an innocent mistake can give rise to a defalcation. See In re Uwimana, 274 F.3d at 811 ("even an innocent mistake [that] results in misappropriation or failure to account" satisfies standard for defalcation); Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997) (defalcation "includes the innocent default of a fiduciary who fails to account fully for money received") (internal quotation omitted); Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1186 (9th Cir. 1996) (same). Finally, the Bankruptcy Appellate Panel for the Tenth Circuit has adopted a negligence standard. See Antlers Roof-Truss & Builders Supply v. Storie (In re Storie), 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997) (concluding that defalcation is "a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, wilful, reckless, or negligent"). In any event, the disagreement between these courts is irrelevant to this case because Potillo's conduct satisfies any of the definitions listed above.

Potillo admitted in a letter faxed to the owner of the plaintiffs
that his misconduct was "grounds for the commencement of legal
action." (Pl. Ex. 4). Potillo's conduct was intentional and
deliberate. His actions constitute a defalcation within the
meaning of § 523(a)(4).

B.   <u>Embezzlement</u>

Even if Potillo was not a defalcating fiduciary for purposes
of § 523(a)(4), his debts to the plaintiffs would still be non-
dischargeable because the debts are the product of embezzlement.
Embezzlement for purposes of § 523(a)(4) is "the fraudulent
appropriation of property of another by a person to whom such
property has been entrusted or into whose hands it has lawfully
come." <u>Moore v. United States</u>, 160 U.S. 268, 269 (1885).[13] "A
creditor proves embezzlement by showing that he entrusted his
property to the debtor, the debtor appropriated the property for
a use other than that for which it was entrusted, and the
circumstances indicate fraud." <u>Brady v. McAllister (In re
Brady)</u>, 101 F.3d 1165, 1173 (6th Cir. 1996); <u>accord</u> <u>Transamerica
Commercial Fin. Corp. v. Littleton (In re Littleton)</u>, 942 F.2d
551, 555 (9th Cir. 1991).

The plaintiffs entrusted Potillo, as an officer of W & J,

---

[13]   <u>Accord</u> <u>Miller v. J.D. Abrams Inc. (In re Miller)</u>, 156
F.3d 598, 602 (5th Cir. 1998); <u>Belfry v. Cardozo (In re Belfry)</u>,
862 F.2d 661, 662 (8th Cir. 1988) (quoting <u>In re Schultz</u>, 46 B.R.
880, 889 (Bankr. D. Nev. 1985)); <u>Spinoso v. Heilman (In re
Heilman)</u>, 241 B.R. 137, 171 (Bankr. D. Md. 1999).

24

with the management of their funds pursuant to the management
agreements entered into by the plaintiffs and W & J.  Potillo
used (or permitted Minor to use) the funds to pay his own
company's operating expenses (as well as some incidental personal
expenses) instead.[14]  Over an extended period of time, Potillo
then concealed the consequences of this ongoing misappropriation
from the plaintiffs.  Moreover, Potillo knew that his conduct was
in breach of contract and unlawful when he engaged in that
conduct.  Potillo's actions present a textbook case of
embezzlement.

III

For the reasons set forth from the bench on November 23,
2005, the court will enter final judgment in favor of Longfellow
in the amount of  $43,295.00, final judgment in favor of Allison
in the amount of $68,573.00, and final judgment in favor of
Randolph in the amount of $71,872.00, all with prejudgment
interest from May 24, 2003, at 6% per annum.  Per the request of
the plaintiffs, the court will enter separate judgments for each
award.  Furthermore, for the reasons set forth from the bench as
amended and supplemented in this opinion, the court concludes
(and the final judgments for each plaintiff will reflect) that

---

[14]  The court has found, however, that Potillo did not
permit Minor's use of the DCHA rent checks deposited after W & J
terminated its management agreement with the plaintiffs, and
accordingly Potillo owes no debt in that regard.

25

Potillo's debts are non-dischargeable pursuant to 11 U.S.C. §

523(a)(4).

Separate judgments follow.

[Signed and dated above.]

Copies to: All counsel of record.